No. 18,701.

GEORGE W. ROBINSON, *Appellee,* v. THE MENNONITE MUTUAL FIRE INSURANCE COMPANY, *Appellant.*

SYLLABUS BY THE COURT.

1. FIRE INSURANCE—*"Vacancy" Clause in Policy—Interpretation.* The condition of a fire insurance policy that if the insured building become and remain vacant for a period of thirty days the policy shall be void unless notice be given and a vacancy permit be issued should be interpreted with reference to its manifest purpose. It contemplates the protection of a guardian of the premises, some individual in charge of them who exercises a preserving superintendency over them and gives them such care and attention as will naturally result in protection against the hazard covered by the policy.

2. SAME. Within the rule stated a dwelling house may not be vacant although not actually occupied as a present place of abode, and such a dwelling house may be vacant although it may be far from being empty of everything but air.

3. SAME. The evidence considered, and held that a farm dwelling house and barn were not vacant although no one slept in the house at night and meals were eaten there only occasionally.

Appeal from Woodson district court; OSCAR FOUST, judge. Opinion filed March 7, 1914. Affirmed.

*J. C. Culver*, of Yates Center, *S. H. Allen*, and *Otis S. Allen*, both of Topeka, for the appellant.

*G. H. Lamb*, and *W. E. Hogueland*, both of Yates Center, for the appellee.

The opinion of the court was delivered by

BURCH, J.: In October, 1911, the defendant issued to the plaintiff a fire insurance policy covering a farm dwelling house and barn. The policy contained the following provision:

"SEC. 19. *Vacant Buildings.* If any building becomes and remains vacant for a period of thirty days the policy thereupon shall become void unless written notice of said vacancy is given to the company and its consent to a continuance of the policy is given by the secretary."

On August 8, 1912, the insured property was destroyed by fire. In an action on the policy the defense was that the house and barn remained vacant from March 1, 1912, to the date of the fire. The jury returned a general verdict for the plaintiff together with the following special findings of fact:

"1. Was the dwelling house mentioned in the policy of insurance sued on occupied by a tenant at the time the policy was issued? Ans. Yes.

"2. If you answer the foregoing question in the affirmative then state when said tenant moved out of said house. Ans. In March, 1912.

"3. Was said house ever occupied as a dwelling by any one after the tenant so moved out of it? Ans. Yes.

"4. If you answer the preceding question in the affirmative give the name of the person who occupied it and state the time when he moved into it. Ans. In March, 1912. Geo. W. Robinson.

"5. Where did the plaintiff live at the time of the fire? Ans. Living on the adjoining farm.

"6. Did the plaintiff or any member of his family live in the house so insured at any time prior to its destruction by fire? Ans. No."

Judgment was rendered in favor of the plaintiff, and the question is whether the verdict and findings are supported by the law and the evidence. The evidence is undisputed, and stated in another way, the question is whether it shows that the property became and remained vacant within the meaning of the policy.

The plaintiff owned the farm on which the buildings stood, but lived one hundred and thirty rods away from them. It was his intention to improve the house somewhat and move into it in the fall of 1912. What he did is shown by the following testimony:

"Q. Now, after the tenant moved out, I will ask how you did in the matter of occupying the premises? A. Well, we moved quite a bit of stuff in the house and we was there almost every day ourselves; had stock in the barn.

"Q. What stuff did you move in the house? A. Well, household furniture of different kinds.

"Q. What household furniture did you move in? A. Well, beds and a sofa and bed spring and stove and quite a bit of bedding and clothes; clothing.

"Q. Family wearing apparel? A. Yes, sir; and then a baby carriage was in there; I don't know whether you call that furniture or not.

"Q. About what was the value of the furniture you put in the house, would you say? A. Well, from one hundred to one hundred and twenty-five dollars.

"Q. Worth of furniture? A. Yes, sir.

"Q. Now, was this—when did you put this furniture in there, after the tenant moved out? A. In March.

"Q. In the same month? A. In the same month; yes, sir.

"Q. Now, you say that you were there at the house frequently? A. Almost every day; we farmed the place extra there.

"Q. Oh, did you farm that land? A. Yes, sir.

"Q. That the house stood on? A. Yes, sir.

"Q. And was there almost every day? A. Yés, sir.

"Q. Now, was the barn also occupied? A. Yes, sir.

"Q. What was it occupied with? A. Well, there was some feed in the barn and a good share of the time there was a horse; one or more in the barn.

"Q. You used it for a horse and feed barn? A. Yes, sir.

"Q. Now, when was you last in the building before the fire? A. I was in the building the day before.

"Q. What time in the day? A. In the forenoon.

"Q. What was you doing there? A. Well, the hired man and myself was fixing the eaves troughs to the cistern and fixing the troughs to our stock and the horses.

"Q. Was any part of your family, to your knowledge, in the building the day of the fire? A. No, sir.

"Q. Or anybody employed by you so far as you know? A. Well, according to the hand he was in there that afternoon out of the rain.

"Q. It had rained? A. It rained that afternoon; yes, sir.

"Q. Had there been anybody sleeping in the house there? A. No, sir.

"Q. Immediately before that? A. No, sir.

"Q. Nobody; nobody actually occupying it at all at the time of the fire; that is, I mean actually living in it; staying in it? A. Living there, no; was n't living right in the house; we was in the house using it every day.

"Q. What you might claim as occupancy of it is your going there from time to time? A. Using it; yes, sir.

"Q. And looking in? A. No, we did n't look in; we was in there.

"Q. Did you keep the house locked? A. Yes, sir; and ate more than one meal there.

"Q. How long before the fire had you eaten a meal there? A. I don't know; been over a week or two; I could n't say to the day."

"There was somewhere near half a ton of hay in the barn at the time it burned. There was probably from an eighth to a quarter of a ton of millet; part in the loft and part in the manger; it had n't been put in there but just a few days; it was prairie hay and millet; old hay. Live stock was in there right along, horses in there almost every day or night. There was one I kept in there at nights up until just a day or two before, and she was in the pasture at the time, that night, and had a couple of colts in there. Could get there all the time. I kept this hay and millet there for the purpose of feeding this stock. I kept the colts there from the first of March till the fire. They was n't in the barn all the time; either in the barn or in the pasture, up to the fire."

The views of the court respecting the law governing the case are expressed in the case of *Insurance Co. v. Johnson,* 69 Kan. 146, 76 Pac. 419. In that case a fire, lightning and tornado policy covered a farm dwelling and a double corn crib. The crib was destroyed by a wind storm. The house was not used or occupied at all and the crib merely had some unused farming implements stored in it. It was held that the vacancy clause of the policy should be construed with reference to its manifest purpose; that it contemplated the protection of a guardian of the premises, some individual in charge of them who would exercise a preserving superintendency over them; and that in view of the vacancy of the house and the use of the corn crib the policy was avoided.

Applying the same rule to the facts of the present case a contrary conclusion must be reached. The court is not disposed to refine upon the terms "vacant" and "unoccupied." Of course, they are distinct words having distinct meanings, but as applied to the subject under consideration it adds nothing to the thought to say that a house is "vacant and unoccupied." Care and attention such as will naturally result in protection against the hazard covered by the policy is the matter in mind. This may exist although, contrary to the

Robinson v. Insurance Co.

defendant's contention, a building may not be actually occupied as a present place of abode. Without this a building may be vacant although, contrary to the plaintiff's contention, it may be far from being empty of everything but air.

In this case the premises were occupied by the owner for substantially all the purposes of a dwelling place except that sleeping there at night was deferred and meals were eaten there only occasionally.

In view of the foregoing it is unnecessary to consider a question of waiver, to which much attention is given in the briefs.

The judgment of the district court is affirmed.

PORTER, J. (dissenting) : I think the undisputed evidence is that the buildings were vacant. The tenant moved out in March; a few days thereafter the owner, who lived in another house on another farm nearly a half mile distant, stored a pile of clothing, a sofa, a baby carriage, a stove and two beds without mattresses in the vacant house. It was his intention to move into the house with his family in the fall. The fact that while engaged during the daytime in doing work in the fields on the place he occasionally went into the house to eat his dinner that he carried with him did not change conditions. The premises were still "vacant" in the sense in which that word is used in policies of insurance. The plaintiff so understood it himself, and claims that he went to the local agent of the insurance company and asked whether it was necessary to have a vacancy permit.

The defense made by the insurance company in this case is not a technical one. The provision that the company shall not be liable if loss occur while the insured premises remain vacant for a period of thirty days is a lawful condition and one that should be up-

held. It was designed to protect the company from the increased hazards resulting from the very condition in which the premises in question were suffered to be when the loss occurred.